| .MICHAEL E. KIRBY, Judge.
Plaintiffs, Rebecca V. D’Angelo and Stephen D’Angelo, individually and as administrators of the estate of their child, Giovanni D’Angelo, appeal the trial court judgment in favor of defendant, Irene M. Prechter, M.D., dismissing plaintiffs’ claims against defendant with prejudice. We affirm for reasons that follow.
This case involves a pregnancy of Rebecca D’Angelo that tragically resulted in *615 the stillborn death of a male fetus on July 30, 1996. During the early part of her pregnancy, Mrs. D’Angelo was under the care of an obstetrician in her hometown of Bay St. Louis, Mississippi. Midway through her pregnancy, Mrs. D’Angelo decided to change obstetricians, and on May 2,1996 began treatment with Dr. Prechter, an obstetrician in New Orleans, Louisiana. The course of Mrs. D’Angelo’s treatment while under Dr. Prechter’s care will be discussed later in this opinion, but it is undisputed that Mrs. D’Angelo developed a condition called preeclampsia, which resulted in the July 30, 1996 death of her unborn child, a son who was to be named Giovanni. Whether Mrs. D’Angelo was preeclamptic at her |2July 23, 1996 visit with Dr. Prechter is in dispute, with differing opinions from expert witnesses on this subject. Preeclampsia is defined as a toxemia occurring in the latter half of pregnancy, characterized by an acute elevation of blood pressure and usually by edema and proteinuria.
A medical review panel found that the evidence in this ease does not support the conclusion that Dr. Prechter failed to comply with the appropriate standard of care as alleged by plaintiffs. The reasons cited by the medical review panel for its conclusion were that Mrs. D’Angelo showed no objective clinical signs of preeclampsia, and Dr. Prechter’s management of Mrs. D’Angelo in the prenatal period was appropriate.
On December 2, 1998, plaintiffs filed a petition for damages against Dr. Prechter for the wrongful death of their stillborn child based on the alleged medical malpractice of Dr. Prechter. Dr. Prechter signed the death certificate, which listed the cause of death as asphyxiation due to placental abruption caused by preeclamp-sia. Plaintiffs’ petition alleges that Dr. Prechter failed to diagnose and aggressively treat Mrs. D’Angelo for preeclamp-sia, and that this alleged failure on her part caused the death of the D’Angelos’ unborn child. Plaintiffs further allege that Dr. Prechter’s actions fell below the standard of care for a reasonably prudent physician treating a patient under similar circumstances.
On June 20, 2002, plaintiffs filed a supplemental and amending petition alleging that Mrs. D’Angelo also suffered damages individually from Dr. Prechter’s alleged negligence, including among other things, bodily injury from | ¡¡uncontrolled medical conditions including hypertension. In the supplemental and amending petition, plaintiffs also requested a trial by jury.
Dr. Prechter filed a motion to strike plaintiffs’ request for jury trial. Plaintiffs did not request a jury trial in their original petition of December 12, 1998, and the defendant, Dr. Prechter, did not request a jury trial in her answer of April 1, 1999. Dr. Prechter argues that plaintiffs’ supplemental and amending petition makes no genuine substantive addition to this case, and that the true purpose of that petition is to circumvent La. C.C.P. article 1733, which requires that a request for jury trial be filed within ten days of the last pleading directed to an issue triable by a jury. Plaintiffs opposed the motion, arguing that the supplemental and amending petition not only requested trial by jury, but also listed additional damages suffered by plaintiffs. Therefore, they argue that the requirements of La. C.C.P. article 1733 were met. The trial court found that the motion to strike the jury trial was well founded, granted the motion and returned this case to the court’s non-jury docket.
After trial, the trial court rendered judgment in favor of Dr. Prechter, dismissing plaintiffs’ claims on June 17, 2003. In reasons for judgment, the trial court stated that the preponderance of the evidence *616 showed that Dr. Prechter did not breach the standard of care for the treatment of a preeclampsia patient. The court found that Dr. Prechter suspected preeclampsia and did not inform Mrs. D’Angelo of her suspicion, but rather treated her for preec-lampsia by ordering bed rest, and requiring Mrs. D’Angelo to return for an office visit in one week instead 14of the usual two-week visit. Dr. Prechter' also took steps to confirm her suspicion by collecting a 24-hour urine specimen. . The court pointed out that at the medical review panel, Dr. Paul Fuselier stated that the requisite standard of care for a case of suspected preeclampsia is ordering bed rest and checking the patient at a more frequent interval, with the frequency of visits left to the judgment of the physician. Plaintiffs appealed the trial court judgment, and Dr. Prechter answered the appeal asking that plaintiffs be ordered to pay the costs of the trial and appellate proceedings.
In Madison v. Ernest N. Morial Convention Center-New Orleans, 2000-1929, pp. 18-19 (La.App. 4 Cir. 12/4/02), 834 So.2d 578, 590, this Court set forth the burden of proof and standard of appellate review in a medical malpractice action against a physician as follows:
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor’s treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276-1277 [ (2005) ]. Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Id; Descant v. Administrators of Tulane Educational Fund, 95-2127, p. 8-9 (La.App. 4 Cir. 1/21/98), 706 So.2d 618, 628. If the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Martin, supra. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot | sbe manifestly erroneous or clearly wrong. Id.; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The determination of an expert’s credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. Id; Martin, supra. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682. The evaluation of and resolution of conflicts in expert testimony are factual issues to be resolved by the trier of fact, and the determinations of the fact finder should not be disturbed on appeal in the absence of manifest error. Id.
On appeal, the plaintiffs first argue that the trial court erred in finding that Dr. Prechter did not breach the standard of care in this case. They contend that the expert witnesses agreed that if preeclampsia is suspected, a physician breaches the standard of care if the patient is not informed of the warning signs of worsening preeclampsia. Plaintiffs argue that because the trial court found that Dr. Prechter suspected preeclampsia, the court erred in finding that Dr. Prechter’s failure to inform Mrs. D’Angelo of the signs and symptoms of worsening preeclampsia was *617 not a breach of the standard of care. Plaintiffs also contend that the trial court erred in finding that Dr. Prechter properly-managed Mrs. D’Angelo’s care because ambulatory management of preeclampsia requires home blood pressure monitoring and office visits at least two times a week.
Dr. Prechter acknowledges that some of the expert testimony was critical of her decisions relating to her treatment of Mrs. D’Angelo. However, she argues that the trial court did not err in finding that a preponderance of the evidence favored her position that she did not breach the standard of care in this case. Before reviewing the testimony on the issue of whether of not Dr. Prechter breached the standard of care in this case, we note that reasons for judgment are | >;not controlling, and form no part of trial court judgments from which appeals are taken. Homes v. Long, 2002-0950, p. 3 (La.App. 4 Cir. 12/18/02), 835 So.2d 877, 878-879.
Dr. Prechter testified that she delivered the D’Angelo’s first child in 1993. Mrs. D’Angelo did not show any signs of preec-lampsia during that entire pregnancy, and she delivered a healthy baby girl. Dr. Prechter stated that a woman is at her highest risk for developing preeclampsia in her first pregnancy that is carried to term.
During Mrs. D’Angelo’s pregnancy that is the subject of this appeal, she first consulted Dr. Prechter on May 21, 1996. At this first visit, Mrs. D’Angelo was approximately 23 weeks pregnant. Her pregnancy was proceeding normally at that time. Dr. Prechter stated that she sees patients every four weeks until they reach the 28th week of pregnancy, every other week from the 28th week through the 36th week, and weekly after the 36th week until delivery.
At Mrs. D’Angelo’s visit of June 25, 1996, approximately her 28th week of pregnancy, Dr. Prechter found that Mrs. D’Angelo’s pregnancy was still proceeding normally, her blood pressure was normal and she did not display any independent edema at that time. At that visit, Mrs. D’Angelo had some protein in her urine, but not an abnormal amount. This was measured in the office with a reaction strip that is dipped into a patient’s urine specimen. Dr. Prechter referred to this as the “dip stick test.”
This “dip stick test” was again conducted at Mrs. D’Angelo’s July 8, 1996 visit, but there was no trace of protein in her urine at that time. The fetal growth and heart tones were appropriate at that visit, and Mrs. D’Angelo did not show any signs of complications, including any signs of impending preeclampsia.
17Mrs. D’Angelo’s next visit with Dr. Prechter was on July 23, 1996, when she was approximately 33 weeks or more than seven months pregnant. At that visit, Dr. Prechter noted that Mrs. D’Angelo had some pitting edema in her ankles and had gained a “worrisome” amount of weight since her July 8, 1996 visit. Her blood pressure was also slightly elevated, but still within normal range. The “dip stick test” conducted on Mrs. D’Angelo’s urine sample did not show the presence of protein at the July 23, 1996 visit, but as a precaution, Dr. Prechter ordered a 24-hour urine test to get a more reliable indication of whether protein was present in the urine and to test renal function. Dr. Prechter instructed Mrs. D’Angelo to return for a visit in one week, rather than the two-week interval usually scheduled for visits in this period of a pregnancy. Dr. Prechter also instructed Mrs. D’Angelo to remain at home for bed rest, and to have the 24-hour urine test done before the next visit one week later.
Dr. Prechter testified that at the July 23, 1996 visit, she did not think hospitaliza *618 tion of Mrs. D’Angelo was indicated because there was no protein in her urine and Mrs. D’Angelo had no history of preeclampsia in her prior pregnancy. Dr. Prechter stated that she did not think Mrs. D’Angelo was developing preeclampsia as of that visit, but she admitted that she knew preeclampsia was a possibility. She stated that the presence of protein in the urine and high blood pressure are the two most important signs of preeclampsia, and neither of those factors was present at Mrs. D’Angelo’s July 23, 1996 visit. Mrs. D’Angelo also denied having any headaches or epigastric pain, which can be symptomatic of preeclampsia. Dr. Pre-chter testified that in her medical judgment, her July 23, 1996 decision to treat Mrs. D’Angelo on an outpatient basis was within the expected standard of care of a physician in her field of obstetrics. She said that if |sshe had been more suspicious of preeclampsia at that visit, she would have ordered Mrs. D’Angelo to have her blood pressure checked during the week between her July 23, 1996 and July 30, 1996 visits.
On July 30, 1996, Dr. Prechter’s nurse informed her that Mrs. D’Angelo was reporting a problem and coming in to the office earlier that day than scheduled. When Dr. Prechter saw Mrs. D’Angelo, she clearly looked preeclamptic. Dr. Pre-chter could not detect a fetal heartbeat. Mrs. D’Angelo was brought to a hospital where a radiologist confirmed Dr. Pre-chter’s suspicion of fetal demise. Dr. Pre-chter induced labor, and Mrs. D’Angelo delivered a stillborn baby.
The plaintiffs presented the expert testimony of Dr. Kevin Stephens, an obstetrician/gynecologist. Dr. Stephens was a member of the medical review panel that unanimously found that Dr. Prechter did not breach the standard of care in this case. At trial, Dr. Stephens testified that his opinion in the medical review panel proceeding was based on a preliminary cursory review of the record. After subsequently reviewing the depositions of the parties and the medical records in this case, he changed his opinion and now believes that Dr. Prechter did breach the standard of care in this case. He stated that Dr. Prechter should have more closely monitored Mrs. D’Angelo after the July 23, 1996 visit. Dr. Stephens stated that a patient showing the signs that Mrs. D’Angelo showed on July 23, 1996 should have been ordered to go to her physician’s office two to three times a week thereafter for blood pressure and weight checks and an in-office test for protein in the urine. He also said that Dr. Prechter should have admitted Mrs. D’Angelo to the hospital on July 23, 1996 to perform the 24-hour urine test. His opinion is also that Dr. Prechter should have informed Mrs. D’Angelo of the signs and symptoms of worsening preec-lampsia.
|flThe defense presented the expert witness testimony of Dr. Vincent Culotta, Dr. Paul Fuselier and Dr. Robert Maupin, all specializing in obstetrics and gynecology. Dr. Maupin also specializes in maternal fetal medicine or high-risk pregnancy management.
Dr. Culotta testified that he was a member of the medical review panel that unanimously found that Dr. Prechter did not breach the standard of care in this case. Prior to trial, Dr. Culotta reviewed the record in this case, and also reviewed depositions taken after the medical review panel rendered its decision. Dr. Culotta testified that he is still of the opinion that Mrs. D’Angelo did not meet the applicable clinical criteria for preeclampsia at her visit with Dr. Prechter on July 23, 1996, and that Dr. Prechter’s prenatal and perinatal care of Mrs. D’Angelo was within the standard of care.
*619 He stated that Mrs. D’Angelo’s blood pressure was within an acceptable range through that date, no edema was reported and there had been no change in the protein in her urine. He said he does not think the standard of care requires hospitalization of a patient with mild transient elevation of blood pressure. He said patients can monitor their own blood pressure at home, but he does not think there was any reason at the time of Mrs. D’Angelo’s July 23, 1996 visit for Dr. Prechter to have advised Mrs. D’Angelo to do so. He testified that Dr. Prechter’s decision to order a 24-hour urine test was appropriate. Dr. Culotta’s opinion was that Dr. Prechter’s decision to follow Mrs. D’Angelo’s condition on an outpatient basis and to order bed rest and the 24-hour urine test was within the applicable standard of care expected of Dr. Prechter.
Dr. Paul Fuselier was also on the medical review panel that unanimously found that Dr. Prechter did not breach the standard of care in this case. He testified 110at trial that based on Mrs. D’Angelo’s condition at her July 23, 1996 visit, Dr. Pre-chter’s decision to order bed rest was appropriate, and there was nothing about Mrs. D’Angelo’s condition on that date that would have warranted her hospitalization. Dr. Fuselier thought that Dr. Prechter’s decision to order a 24-hour urine protein test was more than what most obstetricians would have done given the fact that Mrs. D’Angelo’s in-office urine test on that date was negative for protein. Dr. Fuselier’s opinion at trial was that Dr. Prechter’s decision not to hospitalize Mrs. D’Angelo on July 23, 1996, but instead ordering bed rest and a revisit at a more frequent interval, was prudent and not a deviation from the expected standard of care. In fact, Dr. Fuselier’s opinion was that the care provided by Dr. Prechter to Mrs. D’Angelo was exemplary, and that the tragic result in this case was not predictable based on Mrs. D’Angelo’s condition at the time of her July 23,1996 office visit. Based on his review of the medical records, his opinion is that there was no evidence of preec-lampsia on that date.
Dr. Robert Maupin, a specialist in obstetrics and maternal fetal medicine, testified that his opinion is that the care rendered by Dr. Prechter to Mrs. D’Angelo was well within the expected standard of care. He said that preeclampsia is more common in a woman’s first pregnancy carried to term as opposed to subsequent pregnancies. He testified that the medical records show no significant abnormality in the course of Mrs. D’Angelo’s pregnancy and delivery of her first child in 1993.
With regard to Mrs. D’Angelo’s 1996 pregnancy, Dr. Maupin stated that at Mrs. D’Angelo’s July 23, 1996 office visit, all of her clinical or symptomatic evaluations were normal except that her weight gain was higher than normal, a fact that was noted by Dr. Prechter at the time. He stated that in a two-week interval at the stage of Mrs. D’Angelo’s pregnancy between her July 8, 1996 visit and her |n July 23, 1996 visit, a weight gain of five to six pounds would be normal, so Mrs. D’Angelo’s thirteen pound weight gain was high. But Mrs. D’Angelo’s blood pressure, although slightly higher than on her previous visit, was not high enough for a diagnosis of hypertension. Furthermore, Mrs. D’Angelo was not reporting headaches or epigastric pain, which can be symptomatic features of preeclampsia.
Dr. Maupin’s opinion is that given the results of Mrs. D’Angelo’s clinical and symptomatic evaluations at the July 23, 1996 visit, Dr. Prechter’s decision to order bed rest, a return visit in one week and a 24-hour urine test was appropriate, and was well within the expected standard of care. Furthermore, Dr. Maupin’s opinion *620 is that Dr. Prechter’s decision not to hospitalize Mrs. D’Angelo on July 23, 1996 was also within the standard of care.
In this case, the preponderance of the evidence established that Mrs. D’Angelo’s condition at her July 28, 1996 office visit did not warrant a diagnosis of preeclamp-sia. Dr. Prechter testified that although she knew preeclampsia was a possibility at the July 23, 1996 visit, she did not think Mrs. D’Angelo was developing preeclamp-sia at that time. Drs. Culotta, Fuselier and Maupin reviewed Mrs. D’Angelo’s medical records and the deposition testimony and concurred with Dr. Prechter’s opinion that there was no evidence of preeclampsia at the July 23, 1996 visit, and that other than a higher than normal weight gain since her previous visit, Mrs. D’Angelo’s other clinical and symptomatic evaluations were normal at that time. Furthermore, Drs. Culotta, Fuselier and Maupin all shared the opinion that Dr. Prechter’s decisions made at the July 23, 1996 visit including ordering bed rest, a 24-hour urine test and a return visit in one week instead of waiting the customary two weeks were appropriate and well within the standard of care given Mrs. D’Angelo’s condition at the time of the visit. Although Dr. Stephens | ^disagreed with the other expert witnesses and is of the opinion that Dr. Prechter breached the standard of care in this case, we cannot say that the trial court was manifestly erroneous in ruling in favor of Dr. Prechter, and dismissing plaintiffs’ claim against her. Because we find that the trial court did not err in finding that the preponderance of evidence showed that Dr. Prechter did not breach the standard of care in this case, we need not reach the issue of causation.
Plaintiffs also argue that the trial court erred in striking their jury trial request, which was contained in their supplemental and amending petition. La. C.C.P. article 1733 states:
A. A party may obtain a trial by jury by filing a pleading demanding a trial by jury and a bond in the amount and within the time set by the court pursuant to Article 1734.
B. A motion to withdraw a demand for a trial by jury shall be in writing.
C. The pleading demanding a trial by jury shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury.
There was no request for a jury trial in plaintiffs’ original petition or in Dr. Pre-chter’s answer. In Dr. Prechter’s motion to strike the plaintiffs’ request for a jury trial, she argues that plaintiffs’ supplemental and amending petition makes no genuine substantive addition to this case, and that the true purpose of that petition is to circumvent the time limitations of La. C.C.P. article 1733. Plaintiffs opposed the motion, arguing that the supplemental and amending petition alleges additional damages. The trial court granted Dr. Pre-chter’s motion to strike plaintiffs’ request for a jury trial, stating in the judgment the court’s opinion that the motion was well founded and that the request for jury trial was untimely and inappropriate. We [1snote that no party sought supervisory review of the trial court’s order striking the jury. See, Brown, v. General Motors Corp., 95-244, 95-245 (La.App. 5 Cir. 10/18/95), 662 So.2d 531; Bernard v. Allstate Ins. Co., 396 So.2d 548 (La.App. 3rd Cir.1981). After reviewing the pleading at issue, we do not find that the trial court abused its discretion in striking plaintiffs’ request for a jury trial.
Finally, in Dr. Prechter’s answer to the appeal, she requests that plaintiffs be assessed with all costs of the trial and appel *621 late proceedings. The trial court ordered each party to bear his own costs, and we find no abuse of discretion in that portion of the trial court judgment.
For the reasons stated above, we affirm the trial court judgment.
AFFIRMED.